WILKINSON, Circuit Judge,
concurring in the denial of rehearing en banc:
I concur in the denial of rehearing en banc. Judge Agee has written a persua *392 sive opinion for the court, and I add only these few thoughts in response to my dissenting friends and colleagues. I appreciate the sincerity of the dissenters’ convictions, and I believe the vigorous discussion of our differences to be a mark of mutual respect.
This is hardly an atypical ACCA case. Foster’s instant offense of conviction was being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He had previously been convicted three times for breaking and entering in violation of Va. Code § 18.2-90 (1992) (amended 2004).
As the panel majority explained, the question presented here is whether Foster’s prior convictions for breaking and entering the “Corner Market” and “Sunrise-Sunset Restaurant” satisfy the generic definition of burglary and can thus serve as predicate offenses under the Armed Career Criminal Act (“ACCA”), 18 U.S.C. § 924(e)(1). The Virginia statute can be violated in a variety of ways, including both burglary of an “office, shop, manufactured home, storehouse, warehouse, banking house, church as defined in § 18.2-127, or other house,” which would qualify as generic burglary, and breaking and entering a “ship, vessel or river craft or any railroad car,” which would not. Va.Code § 18.2-90.
State indictments are not structured with an eye to the ACCA, and had the charging documents here quoted the Virginia law, they still would not have used the magic words “building or structure” that would alone seem sufficient to satisfy the dissenters. One could say that of course the enumerated list of “office, shop, manufactured home, storehouse, warehouse, banking house, [or] church” refers to buildings or structures. But then it seems equally obvious that “Market” or “Restaurant” would as well, particularly since the Virginia law’s listing is not exclusive, including as it does any “other house” as a qualifying building.
The panel majority carefully explained why burglary of the “Corner Market” and “Sunrise-Sunset Restaurant” must surely qualify as “unlawful or unprivileged entry into, or remaining in, a building or structure,” Taylor v. United States, 495 U.S. 575, 599, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), within the ambit of the ACCA. The dissenters disagree, however, concluding that breaking and entering the “Corner Market” or “Sunrise-Sunset Restaurant” might not satisfy Taylor because one of those establishments could in fact be something other than a building or structure, namely a non-generic “ship, vessel, or river craft or any railroad car,” Va.Code § 18.2-90.
In urging this unlikely possibility, the dissenters here charge the majority with grossly failing to abide by Shepard v. United States, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). But the dissenters have missed the whole point of what the debate in Shepard was about. The Shepard Court held that the modified categorical inquiry under the ACCA could only be answered by reference to “the charging document, the terms of a plea agreement or transcript of colloquy, ... or to some comparable judicial record,” id. at 26, 125 S.Ct. 1254, and that a sentencing court may not “look to police reports or complaint applications,” id. at 16, 125 S.Ct. 1254.
The Court did not opine on the relative validity of a street address as proof of burglary of a building with anything near the specificity that the dissenters in this case suggest. The Supreme Court majority never discusses the facts that Judge Motz here presses, and the Shepard dissenters refer to them so briefly that only the most careful reader would catch the mention. The Shepard Court had other *393 much bigger fish to fry, focusing its efforts solely on the question of the use of non-authoritative documents to satisfy the demanding ACCA inquiry. My esteemed colleague Judge Motz spends time speculating and hypothesizing why the Shepard Court decided what it did, but the fact remains that the Court decided what it did in fact decide. There was no discussion whatsoever of the point on which my dissenting friend now relies. No court has doubted what the decision stood for — it is where we get the term “Shepard-approved documents” in the first place. And the panel majority here committed no Shepard error. It relied only on the charging documents that spelled out what places Foster has burglarized. It consulted no police reports, complaint applications, or other documents whose use Shepard both addressed and foreclosed.*
That then leaves the dissenters in a difficult position. Unable to accuse the majority that it committed the Shepard error of consulting non-conclusive judicial documents, the dissenters are reduced to claiming that the majority must somehow have resorted to extrinsic evidence. By doing so, the dissenters contend that the majority has diminished the role of the district court and engaged in impermissible appellate fact finding.
Just like its earlier claim of inconsistency with Shepard, this accusation of impermissible appellate fact finding runs acropper. To begin with, classic trial court fact finding involves a selection of a likely or correct choice between two or more factual possibilities. In the land of Oz, I suppose there may be two or more ways to interpret the clear facts set forth in the Shepard-approved documents. On this side of the rainbow, however, the Corner Market and Sunrise-Sunset Restaurant are buildings and structures.
Fact finding also by its very name implies that a fact must be “found.” Here, there is no need to “find” anything. The fact has sought us out. It has relieved the need for findings because the names themselves announce the nature of the establishments, which are buildings and structures. A large and lamentable silence pervades all of the dissenting opinions. They are quick to heap opprobrium on the exercise of the obvious, but slow to suggest what the Corner Market and Sunrise-Sunset Restaurant might be other than buildings or structures.
*394 Further, the classic indicia of trial court fact finding are absent. While my fine colleagues are correct to note the considerable deference accorded trial courts in the fact finding process, the things we normally associate with that process — and the superior vantage point the process affords district courts — are absent here. The trial court heard no witnesses and made no credibility findings. It examined no physical or forensic evidence. It engaged in no trial management function. Instead, the trial and appellate courts are on a parity and had before them the same judicially approved charging statements.
This sort of parity does not entitle us to discount the value of a trial judge’s sound opinion. See United States v. Taylor, 659 F.3d 339, 347-48 (4th Cir.2011) (upholding a trial judge’s determination or “finding” from a plea colloquy that a dangerous assault was indeed a crime of violence as defined by the ACCA). But the parity before us ordinarily suggests something more akin to de novo review. In such an instance, it hardly seems proper to chide the majority for using common sense akin almost to judicial notice. Even appellate judges are endowed with brains in the hope and expectation that they will be used to obvious purpose. We could of course fantasize that somewhere in the craggy highlands of Lee County there exists a floating barge by the name of Corner Market or a railroad car sweetly dubbed the Sunrise-Sunset Restaurant. But neither the Supreme Court nor Congress would either require or indeed approve of such a step.
In fact, the Court has not been afraid to inject an element of practicality in the ACCA when such has been required. This past June, the Court in Sykes v. United States, — U.S. -, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011), upheld the application of the ACCA based on what it frankly described as “the commonsense conclusion that Indiana’s vehicular flight crime is a violent felony.” Id. at 2274. The dissent argues that comparing the Shepard inquiry and the “risk of physical injury” inquiry is like mixing apples and oranges, suggesting that the Supreme Court is somehow jumping to and fro within the same statute on the basic question of whether its provisions merit even a modicum of common sense in application.
But Sykes is only the most recent example of what has become a virtually annual ritual of the Supreme Court deciding all manner of ACCA cases through resort to plain, reasonable logic. In Johnson v. United States, — U.S. -, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010), the Court found that the ACCA’s terms should be interpreted according to their “ordinary meaning” and not be subject to a crabbed “specialized legal usage” that would vitiate Congress’s intent. Id. at 1270. A year prior, the Court in Chambers v. United States, 555 U.S. 122, 129 S.Ct. 687, 172 L.Ed.2d 484 (2009), did not rely on the sort of beyond-a-shadow-of-a-doubt certainty that the dissenters seem to think the ACCA demands, but instead premised its holding on the probabilistic logic that “the behavior that likely underlies a failure to report would seem less likely to involve a risk of physical harm” than escape from custody. Id. at 127, 129 S.Ct. 687. The groundwork for that decision was laid in Begay v. United States, 553 U.S. 137, 128 S.Ct. 1581, 170 L.Edüd 490 (2008), which found that ACCA questions should be resolved based on what the crimes at issue “typically involve.” Id. at 144, 128 S.Ct. 1581. And perhaps most damning, the Court in James v. United States, 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007), was clear that the “ACCA does not require metaphysical certainty.” Id. at 207, 127 S.Ct. 1586. While the dissenters might be able to “hypothesize unusual *395 cases,” id. at 208, 127 S.Ct. 1586, in which the Corner Market, instead of being on the proverbial corner, is instead on a “small river craft,” such conjecture is not only fanciful, but it is at odds with the simple common sense on which the Supreme Court has relied in ACCA cases for five straight years and counting.
I recognize that interpreting the ACCA is not always easily accomplished, and I sympathize with the many jurists who have rightly pointed out its imprecise phraseology and interpretive difficulty. But such challenges come with the territory, and we lack the authority to declare war on statutes we may find distasteful. The dissenters decry the result here as “tragic.” See post at 13 (Motz, J.). I certainly respect their right to hold this view, but it has no bearing on the legal question before us. Theirs is a policy disagreement with the ACCA to be taken up with Congress. If Congress wishes to permit felons to carry certain firearms or to disqualify certain predicate offenses after the passage of time, it can surely do so, but it has created no such exemptions applicable to this case. Congress had a legitimate purpose in mind when it sought to protect the public from violent acts committed by those with a violent criminal history. The statute has an awkward name and the means chosen to pursue its purpose have assuredly created headaches for this fine court and others, but that does not confer on us a warrant — constitutional or otherwise — to eviscerate its aims and displace with our own will the democratic legitimacy accorded by our founding document to others.
There are worse fates for a judicial decision than to have it align with the practical virtues of logic and common sense. The term “objective reasonableness” is much in vogue these days, and properly so. See, e.g., Davis v. United States, — U.S. -, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) (holding that a need “to prevent Fourth Amendment law from becoming ossified,” id. at 2433, cannot overcome objectively reasonable reliance on the law in force at the time of a search). Objective reasonableness presupposes that courts do not allow the occasional medieval tendencies present in all professions to separate us so thoroughly from good logic that our decisions drive citizens to rubbing their eyes and scratching their heads. If one were to inquire of an objectively reasonable person on the street whether something named the Sunrise-Sunset Restaurant was a building or structure as opposed to a river craft or railroad car, the response would be “Of course. Why do you ask?” We ask because the generic approach of modified categorical analysis requires us to, and the Supreme Court has commended to us common sense in answering. That is precisely what the panel majority has done, and it is why I am pleased to concur in the denial of the petition for rehearing en banc.

 Even if one were to take the dissent’s view of Shepard as its guide, the conclusion the dissent urges does not follow. The dissent argues that the Supreme Court has commanded that a street address, and by analogy a descriptive business name, is insufficient evidence of a generic burglary. But the facts of Shepard do not support so broad an inference. To take one example from Shepard, the complaint form includes a street address, 30 Harlem St., in a box labeled "Place of Offense,” Joint App’x, Vol. III, at 5, Shepard, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), 2004 WL 2289702, but then unhelpfully continues to describe the offense as ”break[ing] and entering] in the night time the building, ship, vessel, or vehicle, the property of Jerri Cochran,” id. That complaint form is different from a complaint detailing the street address as the burgled home or residence itself. A street address listed as the "Place of Offense” is less than enlightening as to the nature of what was burgled. Certainly, one would imagine that in a complaint for burglary of a vehicle, the "Place of Offense” listed might be the nearest street address, and so the geographic identifier does not illuminate which of the four possible types of breaking and entering occurred at that particular location. In the case at bar, by contrast, there is no dispute that Foster broke and entered the establishments named the Corner Market and the Sunrise-Sunset Restaurant. It seems clear enough that the specific naming of the premises where Foster’s crimes took place is a stronger factual basis for the application of the ACCA than the mere identification of a street address as the "Place of Offense.”